IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CAROLYN J. KERN, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> NANCY A. BERRYHILL, Acting ) <br> Commissioner of Social Security,[1] ) <br> ) <br> Defendant. ) <br> ) | No. 13 C 8802 <br><br> Magistrate Judge <br> Maria Valdez |

## MEMORANDUM OPINION AND ORDER

This action was brought under 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security denying a claim of Carolyn J. Kern ("Plaintiff") for Disability Insurance Benefits. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow, Plaintiff's motion for summary judgment is granted in part, and the Commissioner's cross-motion for summary judgment [Doc. No. 31] is denied.

## BACKGROUND

### I. PROCEDURAL HISTORY

On June 14, 2010, Plaintiff applied for Disability Insurance Benefits, alleging that she had been disabled since April 11, 2006 due to a back injury, difficulty breathing, chronic obstructive pulmonary disease ("COPD") and hepatitis C. Her

---

[1] Nancy A. Berryhill is substituted for her predecessor, Carolyn Colvin, pursuant to Federal Rule of Civil Procedure 25(d).

claim was denied initially and upon reconsideration, after which she timely requested a hearing before an Administrative Law Judge ("ALJ"), which was held on June 26, 2012. Plaintiff personally appeared and testified at the hearing and was represented by counsel. (R. 41.) Vocational expert Kari A. Seaver (the "VE") and Plaintiff's friend Sammy Clanton also testified. (R. 41, 152.)

On July 5, 2012, the ALJ denied Plaintiff's claims for Disability Insurance Benefits, finding her not disabled under the Social Security Act. (R. 28–36.) The Social Security Administration Appeals Council then denied Plaintiff's request for review (R. 1), leaving the ALJ's decision as the final decision of the Commissioner and, therefore, reviewable by the District Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## II. FACTUAL BACKGROUND

### A. <u>Medical</u>

Plaintiff injured her back on February 17, 2005 while performing her job as delivery-truck driver. (R. 253, 332–33.) After pain relievers and a steroid patch failed to provide relief, she was referred to orthopedic surgeon Kevin M. Koutsky, M.D., who first examined her on March 9, 2005. (R. 332–33.) She reported lower back pain extending to her right leg, as well as numbness and tingling. (R. 332.) A physical exam revealed decreased pinprick sensation in her right foot, a positive right-side straight leg test, muscle tenderness and spasm, and limited lumbar range of motion. (*Id.*) X-rays showed degenerative disc disease and facet arthrosis. (R. 333.) Dr. Koutsky referred Plaintiff for an MRI and recommended physical therapy

for lumbar range of motion, strengthening, and stabilization. He also prescribed anti-inflammatories, muscle relaxers, and pain relievers. (R. 333.)

MRI findings included spondylosis, degenerative disc disease with disc extrusion, and mild to moderate spinal stenosis, all at the L3 to L5 levels of the spine. (R. 336.) Plaintiff began a course of physical therapy and continued to follow up monthly with Dr. Koutsky through the rest of 2005. (R. 336–46.) She saw "a fair amount of improvement" with physical therapy. (R. 336.) Nevertheless, she continued to have chronic disabling back pain, even after enduring three epidural steroid injections. (R. 342.) After discussing the possibility of surgery, Dr. Koutsky referred Plaintiff to neurosurgeon Kenneth Heiferman, M.D. for further evaluation, and Dr. Heiferman agreed that surgery was appropriate. (*Id.*)

Pre-operative evaluation revealed that Plaintiff had Hepatitis C, which she thought she may have contracted from a blood transfusion in 1989. (R. 407.) Plaintiff's back surgery occurred January 31, 2006. Dr. Koutsky and Dr. Heiferman jointly performed her procedures, consisting of bilateral laminectomy of three vertebrae, removal of two discs, and lumbar spinal fusion with cages, screws, and rods. (R. 384.) She remained in the hospital until February 5, 2006.

Plaintiff saw Dr. Koutsky approximately monthly through May 2007. (R. 427–54.) Follow-up X-rays taken on February 16, 2006 showed that her instrumentation was in good position with good spine alignment at L3–L5, and by March 16, 2006, her bone graft appeared to be consolidating. (R. 427–28.) She wore a back brace through April 2006, after which Dr. Koutsky prescribed physical

3

therapy. (R. 429.) Through May and June, she made progress with physical therapy. (R. 430, 433.) Additional X-rays taken in July 2006, six months following her surgery, showed evidence of solid fusion with instrumentation in good position. (R. 435.) Dr. Koutsky noted that Plaintiff was still off work and prescribed continued physical therapy. (*Id.*) He continued to monitor her progress until, more than thirteen months after her surgery, Dr. Koutsky scheduled her work hardening/conditioning program, to be followed by a Functional Capacity Evaluation ("FCE.") (R. 438–446.)

From March to May 2007, Plaintiff completed a work conditioning program under the direction of Michael Rose, a certified athletic trainer and functional assessment specialist. (R. 473–510.) Though she attended all sessions, followed instructions, used proper lifting technique, and was compliant with the program, she experienced increased low back pain from the overall work load. (R. 494–95.) On May 21, 2007, Plaintiff's last day in the program, Mr. Rose administered an FCE which provided a detailed assessment of her physical work capabilities. (R. 473–83.) Mr. Rose indicated Plaintiff could perform work that required a light to medium level of lifting, but she had pain lifting from floor level. (R. 473, 484.) Mr. Rose also opined that, during a workday, Plaintiff could tolerate up to four to five hours of sitting, at sixty-minute durations; three to four hours of standing, at thirty-minute durations; and "occasional" walking of "moderate distances" adding up to no more than three to four hours per day. (R. 474.) Tests of her sitting and standing tolerances, during which the examiner observed her as she performed other

activities in a seated or standing position, supported those opinions: Plaintiff shifted her weight frequently and reported low back pain during both the sitting and standing activities. (R. 482.) After thirty-one minutes of standing, she "went to the floor" and said her back was killing her, explaining that it hurt to stand in one spot and she "needed to be moving around." (R. 482.) Based on other tests, Mr. Rose also opined that Plaintiff could only occasionally bend, stoop, or crouch. (R. 474.) Objective tests of Plaintiff's effort throughout the exam, such as heart rate achieved and consistency of results, led Mr. Rose to conclude that Plaintiff had exerted a maximum safe level of effort and that her test results were valid. (*Id.*)

At Plaintiff's next appointment with her orthopedic surgeon on May 23, 2007, Dr. Koutsky released her to work with the restrictions outlined on the FCE. She was taking medications on an as-needed basis and planned to continue doing her range of motion and strengthening exercises at home. (R. 447.) She returned to Dr. Koutsky for follow-up every three months through July 31, 2008, continuing to do her exercises at home and take medications on an as-needed basis. (R. 454.)

Plaintiff returned to Dr. Koutsky in September 2009 and again in March 2011 reporting additional lower back pain, which Dr. Koutsky characterized as "chronic." (R. 455–56.) She continued her home exercises and medication as needed. (*Id.*) On March 2011, Dr. Koutsky completed a questionnaire in which he indicated that Plaintiff had lower back pain status post spinal fusion, characterized by range of motion limitations and muscle spasms. (R. 511.) He reported that Plaintiff experienced dizziness and drowsiness form medication. (R. 512.) He opined that

5

Plaintiff could walk two blocks before resting or experiencing severe pain, that she could sit for fifteen minutes before needing to get up, and that she could stand for fifteen minutes before needing to sit down or walk around. (R. 512.) She could sit for about two hours and stand or walk for about two hours, total, in a workday. (*Id.*) She needed a job that permitted shifting positions at will and will occasionally need to take unscheduled breaks. (*Id.*) Dr. Koutsky opined that Plaintiff could never lift fifty pounds and could only rarely lift twenty pounds in a work setting, but she could occasionally lift ten pounds and frequently lift less than ten pounds. She could never twist, stoop, crouch, squat, climb ladders, or climb stairs. He opined that her pain would occasionally interfere with her attention and concentration at work, and she was likely to be absent from work more than four days per month as a result of her impairments or treatment. (R. 511, 513.)

On August 26, 2010, Dr. Timothy Brandt completed a medical evaluation of Plaintiff. Among the diagnoses he listed were sciatica status post lumbar laminectomy, depression, and COPD. (R. 400.) He noted that Plaintiff had lower back pain as well as dyspnea (shortness of breath) on exertion. (R. 402.) He opined that, while Plaintiff had full capacity for sitting and for performing her activities of daily living, her capacity for standing was reduced up to 20%; and her capacity for walking, climbing, pushing, pulling were reduced 20–50%; and her capacity to bend or stoop was reduced more than 50%. (R. 403.) He opined that she could lift no more than ten pounds at a time during an eight-hour work day, five days a week. (R.

403.) He also opined that her mental impairments caused a moderate limitation in her concentration, persistence, and pace. (*Id.*)

A January 10, 2011 x-ray confirmed that Plaintiff's spinal fusion hardware was in good position, but there were diminished intervertebral spaces and end plate spurs, and diffuse degenerative disc disease throughout the lumbar spine. (R. 405.)

Internal Medicine Consultative Examiner Debbie Weiss, M.D. reviewed Plaintiff's hospital discharge report from January 2006 and Plaintiff's Function Report, then examined Plaintiff on January 11, 2011. (R. 407.) At that time, Plaintiff estimated that she could sit for up to forty minutes and stand for twenty to thirty minutes. (*Id.*) She experienced variable levels of lower back pain radiating to her right leg, and numbness in her right foot. (*Id.*) Dr. Weiss observed decreased range of motion in the lumbosacral spine due to pain, and a right-side straight leg raise test which was positive only in the supine position. (R. 409.) Other ranges of motion were normal, as was Plaintiff's capacity for fine and gross manipulation of her hands and fingers. (R. 411.) She observed no sensory loss or gait impairment. (R. 410.) Plaintiff also reported constant fatigue, which Dr. Weiss suggested might be related to Hepatitis C, and shortness of breath on exertion, a possible symptom of COPD. (R. 407–08.) Dr. Weiss noted that Plaintiff was taking hydroco, carisoprodol, diazepam, and amitriptyline. (*Id.*)

Medical consultant Dr. Charles Wabner issued an assessment of Plaintiff's Residual Functional Capacity ("RFC") on January 24, 2011, based on a review of Plaintiff's recent x-ray and Dr. Weiss's report. (R. 412–19.) Dr. Wabner opined that

7

Plaintiff could occasionally lift twenty pounds and frequently lift ten pounds; stand or walk for about six hours in an eight-hour workday; and sit for about six hours in an eight-hour workday. (R. 413.) He further opined that she could only occasionally climb ramps or stairs; occasionally balance, stoop, kneel, crouch, or crawl; and never climb ladders, ropes, or scaffolds. (R. 414.) She should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation due to her COPD. (R. 416.)

On April 20, 2011, another state agency reviewer, Vidya Madala, M.D., reviewed Plaintiff's file and updated records and affirmed the initial determination. (R. 541.) Dr. Madala indicated that she had considered Dr. Koutsky's treatment notes of March 2011 and noted that Plaintiff was exercising at home at was neurologically stable. (*Id.*) She did not indicate whether she had considered Dr. Koutsky's 2005–2009 treatment notes or his 2011 questionnaire.

### B. Testimony

In a written Function Report dated December 14, 2010, Plaintiff reported that she was "extremely fatigued" despite sleeping twelve hours each night; that she could not walk more than one block without resting to catch her breath; and that her back pain prevented her from sitting or standing for extended periods of time. (R. 200, 205.) She was able to perform some cleaning, grocery shopping, and small loads of laundry, but became exhausted attending to her personal care. (R. 201–203.) She indicated that she could lift no more than ten pounds and could sit for only thirty minutes before needing to get up and walk around. (R. 205.) She also

8

reported that she needed a cane on "bad days" or for long distances. (R. 206.) She related that her medications made her dizzy, drowsy, and unable to drive. (R. 207.)

At her hearing on June 26, 2012, Plaintiff testified that, after losing utility service to her house, she had moved in with a neighbor, where she had been living for two months. (R. 46.) She said she had difficulty going to get the mail from her mailbox because it made her anxious. Her neighbor got the mail for her, but it was left unopened in a pile in the living room. (R. 47.) She testified that she had developed anxiety to the point that it it was hard to go outside any more, even to the grocery store. (R. 51.) She explained that she was no longer receiving food stamps because she "messed up" and could not get herself together to go to an appointment. (R. 48.) Three people had to help her to make it to her hearing that day. (R. 52.) She had been prescribed Wellbutrin (an antidepressant) but did not have the money for follow-up appointments to refill the prescription. (R. 63.) Based on her hearing testimony, her attorney suggested that the ALJ order a psychological consultative exam. (R. 54.)

As to her physical ailments, Plaintiff testified that, although physical therapy had helped, the pain was always present and always radiated down her leg. She needed to take a pill in the morning to get out of bed. She lay down for about four hours total during the day, in a propped-up reclining position, but still had to get up to move around. She also slept on the reclining couch at night. She was only physically capable of working for a few hours a day due to the need to lie down, which made it impossible for her to go back to her original job and hindered her

from applying for other work. (R. 50.) She was not sure how long she could comfortably stand, but estimated "five minutes maybe." When she sat too long her pain got "worse and worse," went down her leg more, and caused her foot to numb. She had also recently broken her arm, which was "really bad." (R. 62.) Plaintiff stated that she could only got to see her doctor every nine months. She believed her doctor charged her less than he charged other patients, which allowed her to borrow the money to go. (R. 61–62.)

Plaintiff's friend Sammy Clanton also testified, stating that he was her boyfriend and that they had lived together for eight years. (R. 64.) He explained that Plaintiff could not walk for a long period of time and took frequent naps throughout the day. (R. 66–67, 70.) She could sit through an hour of television programs but would get up and walk a little. (R. 68.) He accompanied her when she left the house because she had trouble going out alone, and she did not look at her mail. (*Id.*)

The ALJ next questioned the VE, who identified Plaintiff's past work as a delivery driver at the medium level of exertion. (R. 71.) The ALJ asked whether that work could be performed by someone with an RFC to work a light exertion level; who could not climb ladders, ropes, or scaffolds; who could occasionally climb ramps or stairs, balance, stoop, crouch, kneel, and crawl; and who needed to avoid concentrated exposure to environmental irritants such as fumes, odors, dust, gases, poorly ventilated areas, and chemicals. (R. 71–72.) The VE opined that such a person could not perform Plaintiff's past work due to the exertional requirements.

10

Asked by the ALJ whether there were other jobs available in the economy to someone of the given RFC and Plaintiff's vocational profile, the VE testified that such a person could perform the jobs of assembler, sorter, and hand packer. Upon further questioning, the VE testified that those jobs would allow a sit/stand option, but would not permit the worker to walk around away from the workstation. (R. 73–74.)

### E. ALJ Decision

The ALJ found at step one that Plaintiff did not engage in substantial gainful activity from her alleged onset date of April 11, 2006 through her date last insured of December 31, 2011. At step two, the ALJ found that Plaintiff had the severe impairments of status-post spinal fusion; lumbar degenerative disc disease; chronic obstructive pulmonary disease; and Hepatitis C. (R. 30.) The ALJ concluded at step three that Plaintiff's impairments, alone or in combination, do not meet or medically equal a Listing. (R. 31.) The ALJ then determined that Plaintiff retained the RFC to perform light work except that she had several postural limitations and needed to avoid concentrated exposure to poorly ventilated areas, chemicals, and other environmental irritants such as fumes, odors, dusts, and gases. (R. 31.) Based on this RFC, the ALJ concluded at step four that Plaintiff was unable to perform her past relevant work as a delivery driver, which required a medium level of exertion. (R. 35.) However, at step five, the ALJ considered Plaintiff's age, education, work experience, RFC and the VE's testimony and concluded that there were jobs existing in significant numbers in the national economy that Plaintiff

remained capable of doing during the relevant period. (R. 36.) As a result, the ALJ found that Plaintiff was not disabled under the Social Security Act.

## DISCUSSION

I. **ALJ LEGAL STANDARD**

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work? 20 C.F.R. § 416.920(a)(4).

An affirmative answer at either step three or step five leads to a finding that the claimant is disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). A negative answer at any step, other than at step three, precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps one through four. *Id.* Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Id.*

## II. JUDICIAL REVIEW

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon legal error. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, or resolving conflicts in evidence. *Skinner*, 478 F.3d at 841; *see also Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (holding that the ALJ's decision must be affirmed even if "'reasonable minds could differ'" as long as "the decision is adequately supported") (citation omitted).

The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). In cases where the ALJ denies benefits to a claimant, "he must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ must at least minimally articulate the "analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex*

13

*rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005); *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("An ALJ has a duty to fully develop the record before drawing any conclusions . . . and must adequately articulate his analysis so that we can follow his reasoning . . . ."); *see Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005).

Where conflicting evidence would allow reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the court. *See Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). However, an ALJ may not "select and discuss only that evidence that favors his ultimate conclusion," but must instead consider all relevant evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *see Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014) ("This 'sound-bite' approach to record evaluation is an impermissible methodology for evaluating the evidence.").

## III. ANALYSIS

Plaintiff argues that the ALJ's decision must be remanded because: (1) the ALJ's analysis of her treating physician's opinion was insufficient and resulted in an inaccurate RFC; (2) the ALJ erred in failing to order a mental status exam; (3) the ALJ erred in his credibility findings; and (4) the ALJ improperly rejected the testimony of Plaintiff's witness. Because the ALJ's analysis of the treating physician's opinion is flawed, this matter must be remanded for further proceedings.

## A. <u>Weighing of Opinion Evidence</u>

Plaintiff argues that the ALJ failed to support his finding that Plaintiff could perform light work, in part because he did not appropriately weigh the available medical evidence. The Court finds that the ALJ improperly analyzed the 2011 opinion of Plaintiff's treating orthopedic surgeon, Dr. Koutsky. Further, the ALJ relied on Dr. Koutsky's 2007 work release and Plaintiff's 2007 FCE to arrive at conclusions that are not supported by those documents. Together, these errors warrant remand.

A treating physician's opinion is entitled to controlling weight if it is "well-supported" and "not inconsistent with other substantial evidence" of record. 20 C.F.R. §416.927; *Scott v. Astrue,* 647 F.3d 734, 739 (7th Cir. 2011). An ALJ who affords less than controlling weight to the opinion of a treating physician must furnish "good reasons" for doing so. 20 C.F.R. § 416.927(d)(2); *Scott,* 647 F.3d at 739. And even if a treating physician's opinion is not given controlling weight, the ALJ must still determine what value the assessment does merit and explain his determination, considering "the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the opinion. *Moss v. Astrue,* 555 F.3d 556, 561 (7th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)); *Scott,* 647 F.3d at 740.

Opinions from non-physician providers, including athletic trainers certified to provide FCE assessments, may not be used to establish the existence of a medically

15

determinable impairment. S.S.R. 06-03p, *see* 20 C.F.R. 404.1502. Nevertheless, opinions from such sources "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." S.S.R. 06–03p; *see Guendling v. Colvin,* No. 13 C 3535, 2015 WL 6673833 at 4 (N.D. Ill. Oct. 30, 2015.)

In finding Plaintiff capable of "light work" with some postural limits, the ALJ explicitly rejected the March 2011 opinion provided by Plaintiff's treating orthopedic surgeon, Dr. Koutsky. The ALJ's stated reasons for rejecting that opinion are flawed. Dr. Koutsky began treating Plaintiff shortly after her injury in 2005, performed her surgery in January 2006, and followed up with her regularly through 2007. He saw Plaintiff once each in 2008 and 2009,[2] then examined her again in March 2011 before issuing his opinion. The ALJ declined to give "great or controlling weight" to Dr. Koutsky's opinion in part because he did not find it to be well supported by the record. Elaborating, the ALJ noted, "Dr. Koutsky's records specifically indicate that he released [Plaintiff] to work in May 2007 with limitations consistent with the results of the functional capacity evaluation, [which] demonstrate significantly less limitation" than Dr. Koutsky's subsequent opinion. (R. 34.)

It is true that the 2007 FCE and subsequent work release suggested less limitation than that described in Dr. Koutsky's March 2011 opinion. However, the FCE and work release provided considerably *more* limitations than the ALJ implied

---

[2] The ALJ overlooked the 2009 visit in his opinion, asserting that "it appears that the claimant has not followed-up with Dr. Koutsky or anyone from his office since July 2008 at the time that he provided his March 2011 opinion." (R. 34.)

16

in his decision. The ALJ described the FCE as showing that Plaintiff's "abilities [had] quickly increased to the level of light–medium" exertion. (R. 34.) This is only partially accurate. Exertion levels as defined by Social Security regulations consist of two components: lifting tolerances and sit/stand tolerances. To do light work, a person must be able to lift up to twenty pounds occasionally and ten pounds frequently, *and* must be able to stand or walk for up to six hours per day and sit for up to six hours per day. The FCE here, which was prepared for the purposes of resolving a claim under Worker's Compensation, does not comport with the Social Security Administration's definition of "light work." Instead, the FCE's summary page bases its "light–medium" exertion finding solely on Plaintiff's lifting tolerances, which ranged from twenty-eight to over fifty pounds at varying positions and frequencies. (R. 475.) The FCE did not suggest that Plaintiff could stand or walk for six hours per day. Instead, it provided "tolerance recommendations" of four to five hours per day total of sitting in durations of up to one hour; three to four hours a day total of standing in durations of up to half an hour; and three to four hours per day of walking at "occasional, moderate distances." (R. 475.) Those limits were consistent with Mr. Rose's observations, as recorded in the narrative portion of his report, of Plaintiff's difficulties sitting and standing. (R. 482.)

The ALJ nowhere acknowledged the discrepancy between Plaintiff's sit/stand limits and the Administration's definition of "light work," even as he used the 2007 work release to discredit Dr. Koutsky's later claims. The ALJ instead endorsed the light work finding of two agency physicians who had not reviewed the FCE or the

17

bulk of Plaintiff's treatment records. The Court is therefore unable to determine how, in crafting his RFC, the ALJ accounted for the sit/stand/walk limits in the 2007 FCE and in Dr. Koutsky's subsequent work release, which were considerably more restrictive than the regulatory definition of even "light" work. The ALJ has therefore failed to build the requisite "accurate and logical bridge from the evidence to his conclusion." *Clifford v. Astrue,* 227 F.3d at 872.

### B. Remaining Arguments

Because the above-described errors in weighing medical evidence mandate remand, the Court need not address Plaintiff's remaining arguments at this time. However, on remand, the Commissioner is advised to consider Plaintiff's testimony in light of the recent guidance provided by SSR 16-3p and focus on Plaintiff's asserted symptoms. *See Cole v. Colvin,* 831 F.3d 411, 412 (7th Cir. 2016).

### CONCLUSION

For the foregoing reasons, Plaintiff Carolyn J. Kern's motion for summary judgment is granted in part, and the Commissioner's cross-motion for summary judgment [Doc. No. 31] is denied. The Court finds that this matter should be remanded to the Commissioner for further proceedings consistent with this Order.

**SO ORDERED.**  **ENTERED:**

*/s/ Maria Valdez*

**DATE:   April 11, 2017**

**HON. MARIA VALDEZ**
**United States Magistrate Judge**